**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4491-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FREDDIES CRESPORIOS,

     Defendant-Appellant.

_____

Submitted October 18, 2017 – Decided April 11, 2019

Before Judges Fuentes and Suter.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-10-2608.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Robert D. Laurino, Acting Essex County Prosecutor, attorney for respondent (LeeAnn Cunningham, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

An Essex County Grand Jury indicted defendant Freddies Cresporios with crimes allegedly committed on two separate dates and involving separate, unrelated victims. Counts one thorough four alleged crimes defendant allegedly committed against Victor Delgado on May 13, 2014. Count one charged defendant and "an unknown unindicted co-conspirator" with second degree conspiracy to commit robbery, N.J.S.A. 2C:5-2; count two with first degree robbery, N.J.S.A. 2C:15-1; count three with second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and count four with second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a).[1]

Counts six through nine charged defendant with crimes he allegedly committed on May 14, 2014 against Deidre Allen and Raquan Allen. Specifically, count six charged defendant with fourth degree aggravated assault by knowingly and under circumstances manifesting extreme indifference to

---

[1] The indictment also includes two counts against a man named Ahmad Knight. Count five charged Ahmad Knight with fourth degree receiving moveable property on May 13, 2014, consisting of a black LG cellphone valued between $200 and $500 belonging to Victor Delgado, knowing or believing it had been stolen, N.J.S.A. 2C:20-7(a); count ten charged Ahmad Knight with committing third degree burglary on May 14, 2014, by entering a building located on Berkley Avenue in the City of Newark, which was not at the time open to the public and which Knight was not licensed or privileged to enter. The State severed these counts against Knight. Defendant's trial did not include these counts and Knight is not part of this appeal.

human life when he pointed a firearm at or in the direction of Deidre Allen, N.J.S.A. 2C:12-1(b)(4); count seven charged defendant with committing the same fourth degree aggravated assault against Raquan Allen, N.J.S.A. 2C:12-1(b)(4); count eight charged third degree unlawful possession of a rifle, N.J.S.A. 2C:39-5(c) [2]; and count nine with second degree possession of a firearm, N.J.S.A. 2C:39-4(a).

On May 8, 2015, nearly eight months before the start of trial, defendant filed a motion pursuant to Rule 3:15-2(b) to sever counts one through four from counts six through nine. The court denied defendant's motion. The trial started on January 7, 2016. Thirteen days later, the jury returned a verdict finding defendant guilty on all of the charges. The trial judge sentenced defendant to an aggregate term of sixteen years imprisonment subject to the eighty-five percent parole ineligibility period and five years of parole supervision under the No Early Release Act, N.J.S.A. 2C:43-7.2.

Against this procedural backdrop, defendant argues the trial judge committed reversible error in denying his motion to sever. Defendant claims allowing the State to try these two unrelated crimes in one trial was highly prejudicial and irreparably undermined his right to a fair trial. Defendant also

---

[2] The indictment erroneously cited N.J.S.A. 2C:39-5(b) with respect to count eight. The prosecutor corrected this error during trial.

argues the trial judge erred in denying his motion for a judgment of acquittal on the second degree conspiracy charge and the third degree charge of unlawful possession of a rifle. Finally, defendant argues the aggregate sentence imposed by the court was manifestly excessive.

After reviewing the record developed before the trial court, we conclude the trial judge mistakenly exercised his discretionary authority when he denied defendant's motion to sever counts one through four from counts six through nine pursuant to Rule 3:15-2(b). State v. Sterling, 215 N.J. 65, 73 (2013). In this light, we decline to reach defendant's argument attacking the sufficiency of the evidence to sustain his conviction for second degree conspiracy and third degree possession of a rifle. Our decision to overturn defendant's conviction on the severance issue and remand the matter for a new trial also obviates the need to reach defendant's excessive sentence argument.

I

A

The May 13, 2014 Incident

At approximately eight o'clock in the evening on Tuesday May 13, 2014, Victor Delgado took the light rail train to visit his cousin in Newark. The train stop left him three blocks away from his cousin's home. When he was about one

block from his cousin's house, Delgado noticed two individuals walking towards him coming from the opposite direction. Delgado testified the individuals were "about four or five meters"[3] from him when he was "face-to-face with them." Although they crossed paths, Delgado candidly admitted he "wasn't paying attention because [he] was walking like any normal person."

The prosecutor provided Delgado with a photograph of the area and asked him to place an "X" where he first saw the two individuals.[4] The two men were on the same side of the sidewalk as Delgado when they crossed paths. After they crossed paths, the two men "stayed for a minute" and then began to follow Delgado. At some undetermined point, the two men "split up." One was on Delgado's side of the street and one was on the other side of the street. In response to the prosecutor's question, Delgado confirmed these two men were the ones who robbed him. The prosecutor asked:

> Q. Did one of the two people who robbed you have a gun?
>
> A. Yes.

---

[3] Pursuant to N.J.R.E. 201(b), we take judicial notice that a meter equals 3.28 feet. Thus, Delgado was about 13.12 to 16.4 feet away from these individuals. The record does not reflect the jurors were provided with this conversion.

[4] This exhibit is not part of the appellate record.

> Q.  Was the one who was on your side of the street the one who had the gun or the one who did not have the gun?
>
> A.  The one that did not have the firearm was the one that was on my side of the street.

Delgado then testified that the robber who was <u>unarmed</u> was the one who was standing behind him.    However, as the following colloquy illustrates, the identity of the assailant who actually possessed the handgun is not entirely clear.

> Q.  So, Mr. Delgado, was the person who was following you, was he directly behind you or was he to the left of you or the right of you?
>
> A.  To my left.  To my left.
>
> Q.  And how far would you say he was to your left?
>
> A.  About five meters.
>
> Q.  Can you show me -- is this five meters or are we less than five meters or more than five meters?
>
> A.  About that distance.[5]

The man who was behind Delgado continued to follow him until he arrived at his cousin's house, which took "like two, three minutes."  As Delgado was about to open the gate of his cousin's house, the man behind him "kicked the door so I couldn't open it and he pushed me."  According to Delgado: "I

---

[5]  Although the record does not include a narrative description of the distance, five meters is 16.4 feet.

pushed him back, but within seconds when I turned around there was another individual behind me with a pistol and he hit me and he was pointing the gun at me." Both robbers told him to give them "all [his] things." Delgado testified the robbers took his backpack, cell phone, the cash he had on his person, and his keys.

At this point in the trial, the prosecutor played a video recording taken from a security camera. Delgado confirmed the video depicted the "front of [his] cousin's house." Delgado also identified an individual in the video as one of his assailants. This person was wearing black pants and a blue sweater. Delgado identified a second individual who appeared in the video. Delgado referred to him as the man who "was fighting with me." At the prosecutor's request, Delgado approached the television screen displaying the video recording. The prosecutor then asked Delgado the following questions:

Q. What does this person appear to be doing?

A. Which one?

Q. The one all the way to the left of the TV screen.

A. He seems to be fighting with me. And he was blocking my way to my cousin's house.

. . . .

Q. What does it appear that you're doing in the video?

A. I was calling out to my cousin to come open.[6]

According to Delgado, the robbery lasted "[o]ne minute only." When the prosecutor asked him if he looked at "either of their faces," Delgado responded: "Yes, to the one that had the hat." Delgado also testified that he had looked at the video before trial "once or twice only." He called the police approximately thirty minutes after the robbery, "but they never came." Delgado's first interaction with the police did not occur until Wednesday May 14, 2014, the day after the robbery. Delgado testified the police called him "[b]ecause they had my phone."

The prosecutor played another video recording to the jury. Delgado testified he had not seen the video before that day in court. The prosecutor asked Delgado if the two individuals depicted walking in the video "look like the same individuals that robbed you shortly thereafter?" Delgado responded: "Yes, they look like [sic] because one has a sweater and the other one has the hat." Delgado testified the man who was in possession of the handgun during the robbery stood behind him and actually pressed the handgun against his back.

---

[6] Defense counsel did not interpose any objections to this line of questioning by the prosecutor.

B

The May 14, 2014 Incident

Raquan Allen testified that on May 14, 2014, he was walking with his mother Diedre Allen[7] in the area of an "abandoned residence" located on Berkeley Avenue in Newark.  At the time, Allen lived approximately one block away from this house and often walked passed it on his way to work or to shop at a nearby store.  When the prosecutor asked Raquan Allen why he believed the house was abandoned, he responded: "I knew that.  There was not supposed to be anyone in that house."  He described the house as being in "very poor" condition with the front door "barely on the hinges."  The prosecutor continued with this line of inquiry:

> Q.  Is that the way it was on May 14, 2014?
>
> A.  Yes.
>
> Q.  Basically it was open season, people could go in or out?
>
> A.  Yes.
>
> Q.  Mr. Allen, how many people would you say, rough estimate, were squatting or staying --

_____

[7]  Diedre Allen did not testify at trial.

A. Chilling, doing whatever.

Q. -- at [the house on] Berkeley Avenue?

A. Well, sometimes when it was kind of a good night, like a summer night, it would probably be about nine, [ten] people be [sic] out there.

However, other than seeing them as he walked by the house, Allen admitted he was not "too familiar" with those individuals.

On May 14, 2014, Allen and his mother went to the house on Berkeley Avenue "to see if anyone was around there." Although Allen did not identify the time of day at trial, the State's appellate brief indicates he and his mother were in front of the Berkeley Avenue property "[l]ess than 17-hours after" the Delgado robbery. Since the Delgado incident occurred at around 8:00 p.m. on May 13, 2014, we infer the incident involving Raquan Allen and his mother occurred at approximately 1:00 p.m. on May 14, 2014.

Allen testified that he and his mother went to this abandoned house that day to take pictures of the license plates of cars parked around the property because "someone came around to my house and pointed at my house in stolen cars." When asked whether it was his "impression [if] that person had come" from that house, Allen responded: "Yes, I know that for a fact." The prosecutor continued with this line of questions:

Q. And what, if anything, happened while you and your mother were in the process of doing that?

. . . .

At any point did anyone say anything to you?

A. Yes.

Q. I'd like to turn your attention to that. What are we talking about?

A. We're talking about when I was in front of that house, when I was taking a picture, he came -- he came to the window, he said, "Oh yeah, whatever. You want to take a picture, whatever the fuck?"

And I said, "Yeah, I am going to take a picture of this address, and stuff."

And he said, "Okay, hold on, hold on right there."

At this point in the proceeding, the prosecutor showed Allen a photograph the witness took that same day. Allen testified the photograph depicts his mother Diedre Allen standing next to him and defendant wearing a "red shirt with the headphones on." According to Allen, he first saw defendant's face in the window of the house, approximately ten feet away from where he was standing. He testified he had seen defendant "a lot of times" before that day. After he told

11

defendant he was going to continue to take pictures, defendant "ran out of the house with a gun, whatever he was holding, and he pointed it up like this and begin [sic] to run after me and my mother . . . [.]" Allen had not seen the rifle before that day. He described it as "brown and black."

Allen testified defendant began to chase him and his mother, causing them to "sprint" away. Allen also claimed he looked back as he sprinted "numerous times . . . to make sure that my mother wouldn't be hurt." Allen testified that defendant "started to stop sprinting and I guess he ran back in the house." Allen called 911 to report the incident. Without objection, the prosecutor played the audio recording of the 911 call to the jury. The police responded to the abandoned house a "few minutes" after Allen's 911 call. After "briefly" discussing what happened with Allen, "a lot of undercover cops" ran inside the house. Newark Detective Willmorys Velazquez was one of the police officers who entered the abandoned house in response to Allen's 911 call. He described the house as "clearly empty, broken windows, garbage, broken furniture, a lot of debris inside of the hallway." Velazquez found only one person inside the house whom he described as "a black male." This man was sleeping on a bed consisting of a "box spring and . . . mattress sitting on the floor." Velazquez testified this man was later identified as Ahmad Knight. Knight had a cell phone

12

on his person. According to Velazquez, Knight "spontaneous[ly]" said he just found it.

Velazquez testified that inside the house he found "a black bookbag . . . [and] an air rifle that was propped up against the corner of the room." The prosecutor also asked Velazquez a series of questions to reveal how the police discovered who owned these items.

> Q. What, if anything, did you do with the backpack . . . and the phone that you said you found on Mr. Knight?
>
> A. We took it and we confiscated it as evidence.
>
> Q. At any point did you come to learn the origin of these two items?
>
> A. Yes.
>
> Q. How did that come about?
>
> A. We took the cell phone and we reached out to the last call made on the phone and we asked the person that [sic] picked up if that was their phone.
>
> Q. And what did they say?
>
> A. They said no, it was a friend of his that was previously robbed the night before, I believe.[8]
>
> Q. Did they give you that person's name?
>
> A. Yes.

---

[8] Defense counsel did not object to this hearsay testimony.

Q. What was that person's name? Do you remember?

A. I do not recall his name.

Q. Was it Victor Delgado?

A. Possibly.

After the prosecutor refreshed his memory with a copy of a police report, Velazquez confirmed the unknown person on the phone told him Delgado was the owner of the cell phone. Delgado eventually responded to the police station and identified these items as the property that had been taken from him on May 13, 2014. The prosecutor also asked Velazquez about the rifle he found inside the house as follows:

> Q. What, if anything, did you and the other officers do with Ahmad Knight?
>
> A. We detained him and then we got the victims to come and possibly ID him, if that was the suspect . . . [who] pointed the rifle at them.
>
> Q. When we're talking about victims, we're talking about Deidre and Raquan Allen again?
>
> A. Yes.
>
> Q. When you were holding Mr. Knight, were there any other individuals with him?
>
> A. No.
>
> . . . .

Q. And did [Deidre and Raquan Allen] say whether or not that was the individual who pulled the gun on them?

A. They said that was not the individual.

The police charged Knight with burglary and unlawful possession of a firearm. On cross-examination, Velazquez testified that Delgado said the clothes the police found in the backpack did not belong to him.

C

May 15, 2014 Incident

At approximately 8:30 a.m. on May 15, 2014, Velazquez and the remaining plain clothes officers who responded to Allen's 911 call the previous night, returned to the abandoned house on Berkeley Avenue because: "We were getting several complaints about it, about drug dealing happening there, squatters, and again, to see if we could find anyone with regard to the similar incident." They entered the residence through the side door and found one individual sleeping in the same "make-shift bed." This time, the individual was a Hispanic man later identified as defendant. He was arrested for trespassing. When the prosecutor asked Velazquez why defendant was not charged with anything else, Velazquez candidly responded: "At that time, we did not have the victim of the robbery to identify him." Velazquez also testified that he found

A-4491-15T2

three nine millimeter bullets in the kitchen of the house that were not there the previous day when he arrested Knight.

D

The Investigation

Detective Donald Stabile, of the Newark Police Department Robbery Squad, took over the investigation on May 16, 2014. Although from a strict chronological perspective Stabile was the last detective involved with these three incidents, he was the first witness to testify for the State in this trial. As the following testimony illustrates, the prosecutor asked Stabile to explain how he saw a connection between the Delgado robbery and the attempted assault on Mr. Allen and his mother. Stabile testified that the first step was "chronological order, what's going on here and how did the events occur." He then looked at other incidents that occurred in the area. He noted the alleged similarity of the description of the perpetrator given by the victims in both incidents: "Hispanic male, low-cut hair, approximately five-six, five-seven in height, clean shaved."

The most troubling part of Stabile's testimony related to the use of arrest photographs. The following line of questions by the prosecutor illustrates this point:

Q. What are those?

16

A. These are arrest photographs.

Q. Who are they arrest photographs of?

A. S-22 is the arrest photograph of Mr. Ahmad Knight.

Q. S-23?

A. S-23 is the arrest photograph of Mr. Freddies Crespo-Rios.

Q. Are those photographs from that May 13th week?

A. The arrest of Mr. Knight is dated, date of arrest is 5/15/2014. The arrest of Mr. Crespos is 5/23/14, which was the date the photograph was taken. His actual arrest was May 22nd.

Q. This was the second time --

A. I'm sorry, May 21st.

Q. <u>This was the second time he was arrested in the hotel on the highway, correct</u>?

A. That is correct.

The prosecutor, in the presence of the jury, moved to introduce these photographs into evidence. This prompted the judge to conduct the following sidebar conference:

> THE COURT: Are you seeking to introduce the photograph alone or the whole document?
>
> PROSECUTOR: I mean -- it comes from this particular arrest. There's nothing about it prior.

THE COURT: But you're seeking to introduce the entire document, not just the photograph?

PROSECUTOR: If you want.

THE COURT: I'm wondering what you're going to seek to introduce. If [defense counsel] has an objection to the entire document --

DEFENSE COUNSEL: No. What I'm concerned about is that I already made a comment he was taken to the police station and they did fingerprints and all that and he was released. This is a different date. This might suggest to the jury that, why is the Sheriff Department getting involved in his arrest when he was arrested by the Newark Police? I know there was an arrest report that was prepared on the day of his arrest, on the 22nd, from the Newark Police.

To assuage defense counsel's concerns, the prosecutor suggested publishing the exhibits to the jury from a distance "so they're not reading the words." The trial judge ultimately intervened and directed the prosecutor to "fold" the exhibits "on the top part and then we'll redact it later." The judge then announced the following exhibits were admitted into evidence: S-22, Arrest photo of Ahmad Knight, and S-23, Arrest photo of Freddies Crespo-Rios. The judge did not issue any instructions to the jury limiting the probative value of these exhibits.

On May 17, 2014, Stabile met with Delgado. According to Stabile, Delgado described the unarmed assailant as a Hispanic man "approximately five-seven, approximately 180 pounds, wearing dark clothing[.]" The assailant who was armed with a "gun" was also a Hispanic man, but with a heavier build. He wore "dark clothing with a blue, like a sweat-hood pulled over his head."

Allen had seen defendant and Knight "multiple times" before the May 14, 2014 incident. He described Knight as "tall and dark" and defendant as "shorter and lighter." Detective Stabile testified that Mrs. Allen described the man she encountered as a Hispanic man, between nineteen and twenty years old, without facial hair, and a short haircut. Although Stabile initially testified that Mrs. Allen mentioned the individual was approximately 180 pounds, upon closer review of her recorded statement, Stabile clarified that she did not say anything about the individual's weight. Mrs. Allen also stated the individual was wearing a "[b]lack shirt, black ball cap, [and] dark jeans[.]"

In his direct testimony, Stabile made clear that Delgado did not identify the type of firearm his assailants had in their possession at the time of the robbery. The only description Delgado gave of the weapon was "a dark gun." Stabile also testified that a different detective conducted the photo array identification procedure involving Allen and his mother. They both selected

19

defendant's photograph as the one that depicted the man who chased them with the rifle.

On cross-examination, Stabile testified that neither Mr. Allen nor his mother were ever shown nor asked to identify the rifle found in the Berkeley Avenue house. Stabile explained:

> A. . . . I was prepared to show them photographs of that rifle recovered, however, both of them consistently in their statements identified a different style of rifle/shotgun.
>
> Q. Just so that I understand, are we talking about two different types of weapons or just one weapon being called different types of things? . . .
>
> A. They identified specifically in the statements that Mr. Crespo-Rios pointed and chased them with a sawed-off shotgun. Recovered was a pellet -- a rifle -- a BB gun.
>
>     . . . .
>
> Which doesn't match what a sawed-off shotgun looks like.
>
> Q. That's I guess why I was asking you. If -- once this rifle was recovered whether -- in order to clear up any possible confusion -- they were shown it to see if that's what they saw?
>
> A. There was no confusion, it was cleared. They confirmed it was a sawed-off shotgun and there's a difference.

Q. On May 14th, to your knowledge, was a sawed-off shotgun found in [the] Berkeley Avenue [property]?

A. No.

As part of Stabile's direct testimony, the jury saw a video recording of the May 13, 2014 Delgado robbery. Stabile provided the following commentary in the course of the video:

> To sum up, you had the individual walk across the street and <u>brandish a handgun</u> from his right side. As he approaches onto the sidewalk, there appears to be two other persons over here. As the video is actually moving in flow, you can see that there's a struggle as the person with the gun then joins in, into that struggle.
>
> [(Emphasis added).]

This video recording does not support a definitive identification of defendant as a participant in either the May 13, 2014 Delgado robbery nor as one of the assailants in the May 14, 2014 Allen incident. The handgun Stabile described being brandished by one of the assailants in the Delgado robbery is not in any way related to the Allen incident. The only connection between these two facially unrelated events is found in Allen's testimony in response to a still photograph taken from this video.

Q. Mr. Allen, do you see an individual . . . on the right hand of that photograph near the white car?

A. Yes, I see him right there.

Q. What does that individual appear to be wearing?

A. A black cap and black t-shirt.

Q. I know it's blurry, but does that appear to match what you're describing?

A. Yes.[9]

Counsel stipulated defendant is five feet, six inches tall and was born in May 1994. Stabile also acknowledged that according to defendant's photograph, he weighed 130 pounds and did not have any weapons on his person at the time of his arrest on May 21, 2014.

II

Against this factual drop, defendant raises the following arguments.

POINT I

IT WAS ERROR TO DENY SEVERANCE OF COUNTS ONE THROUGH FOUR FROM COUNTS SIX THROUGH NINE WHERE THE COUNTS CHARGED SEPARATE, DISTINCT CRIMINAL INCIDENTS THAT OCCURRED ON DIFFERENT DATES, INVOLVED DIFFERENT VICTIMS, AND DID NOT SHARE A COMMON MOTIVE OR INTENT.

POINT II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF

---

[9] Defense counsel did not interject any objections to this line of questions.

ACQUITTAL AS TO THE CONSPIRACY AND UNLAWFUL POSSESSION OF A RIFLE COUNTS AS THE STATE DID NOT PROVE THE ELEMENTS OF THOSE OFFENSES BEYOND A REASONABLE DOUBT.

POINT III

THE AGGREGATE SIXTEEN-YEAR STATE PRISON TERM, SUBJECT TO AN EIGHTY-FIVE PERCENT PAROLE DISQUALIFIER, IS MANIFESTLY EXCESSIVE.

We are satisfied the court erred in denying defendant's motion to sever the two unrelated events that occurred on different dates, and involved two unrelated victims. Rule 3:7-6 provides that:

> [t]wo or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by R. 3:15-2.

Defendant filed a pretrial motion to sever counts one through four, which are exclusively related to the Delgado robbery, from counts six to nine, which exclusively involved the Allen incident. Defendant argued these incidents were completely unrelated and constituted factually distinct events. Defense counsel noted that the Delgado incident involved an armed robbery carried out by two

assailants; the armed assailant threatened Delgado with a handgun in front of the entrance of the victim's cousin's home. Delgado described the weapon used by his assailants as a "black gun." The video of the robbery entered into evidence by the State through Detective Stabile's testimony shows the assailants used a handgun. The police did not respond to Delgado's call that day.

The Allen incident occurred the following day, May 14, 2014. The crimes related to this incident involved a dilapidated abandoned dwelling, well-known to the victims as a nuisance to the community and a place to conceal illicit activities. Allen, the only State witness who had personal knowledge of this incident, testified that the activity that triggered the incident involved he and his mother taking photographs of cars that were parked in front of or near this house. At this point, defendant, who had been staring at them through a window in the house, ran out and began to chase them down the street armed with a sawed-off shotgun. The police did not recover any weapon fitting this description. When the police responded to Allen's 911 call, they arrested Ahmad Knight, not defendant. The State indicted Knight with fourth degree possession of a black LG cellphone that belonged to Delgado and third degree burglary. However, the State successfully moved to sever the charges against Knight.

When the judge denied defendant's motion to sever, he provided the following explanation in support of his ruling:

> The test for determining whether joinder is prejudicial is whether assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under New Jersey Rules of Evidence 404(b) in the trial of the remaining charge. And that's Sterling, 215 N.J. at 73. A defendant must make some showing that the joinder would prejudice him.
>
> In considering all of the common evidence, the contemporaneousness of the events, the proximity of the locations of both events and the significant evidentiary factors such as the fact that the cell phone and backpack of Mr. Delgado were recovered in the location where the defendant was arrested and that both Mr. Delgado and the Allen's identified the defendant as the perpetrator of each crime alleged.
>
> The Court does not find any demonstrated prejudice to the defendant and finds that the joint trial of these counts in the interest of judicial economy do not cause any prejudice to this defendant for the reasons stated herein.
>
> Therefore the motion to sever is denied for the reasons stated on the record here today.

We disagree and reverse. As the Court made clear in Sterling:

> [T]he inquiry only begins with an assessment of whether there is similarity or a connection between charges because one involves evidence probative of another charge. Even if that threshold standard is satisfied, the court remains obligated to assess for prejudice, which may require the granting of relief from

25

joinder. For that, the test employed under N.J.R.E. 404(b) provides the appropriate analytical framework.

[Id. at 92.]

We approach our analysis mindful of the admonition that N.J.R.E. 404(b) is a rule of exclusion, not inclusion. State v. Nance, 148 N.J. 376, 386 (1997). N.J.R.E. 404(b) states:

> Except as otherwise provided by Rule 608(b), [not relevant here] evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [(Emphasis added).]

The Supreme Court established a four-prong test to determine the admissibility of evidence under N.J.R.E. 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

26

[State v. Cofield, 127 N.J. 328, 338 (1992) (citation omitted).]

As a threshold issue, there is no legally sustainable basis to admit the evidence related to the Allen incident in the trial of the Delgado robbery. The two incidents involved separate victims with no discernable connections, occurred on separate dates, and in materially different locations. Delgado was attacked by two men acting in concert. The two assailants approached the victim, passed him, and then quickly separated as a tactical maneuver. When Delgado attempted to repulse a frontal assault, one of the assailants, armed with a handgun, immediately responded from behind.

In sharp contrast, the Allen incident was an unanticipated, impromptu reaction to Allen and his mother's activities which were perceived by the actor to be potentially threatening. His response was not only unplanned but poorly executed. His actions prompted an immediate response by the police. Unlike Delgado, Allen and his mother were well acquainted with the precise location and its per se criminal inhabitants. Indeed, but for the unrelated Delgado robbery, a rational jury could find defendant's actions amounted only to harassment. N.J.S.A. 2C:33-4. The State did not find the alleged sawed-off shotgun. In short, based on Delgado's account, there is no rational basis to

connect a robbery with a handgun to an unlawful possession of an air rifle or the offense of trespassing based on sleeping on a mattress on the floor of a dilapidated, abandoned house.

The Court noted in Sterling:

> The relief afforded by Rule 3:15-2(b) addresses the inherent "'danger[,] when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all.'" A court must assess whether prejudice is present, and its judgment is reviewed for an abuse of discretion. The test for assessing prejudice is "whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." N.J.R.E. 404(b) requirements must be met, and the evidence of other crimes or bad acts must be "relevant to prove a fact genuinely in dispute and the evidence is necessary as proof of the disputed issue[.]"
>
> [215 N.J. at 73 (citations omitted).]

The inapplicability of prongs one and two under the Cofield test render any further analysis unnecessary. The prejudice caused by the denial of defendant's pretrial motion to sever under Rule 3:15-2(b) is self-evident. The combination of these two unrelated criminal acts painted defendant as a marauding predator. One day, he is seizing the opportunity to pounce on an

A-4491-15T2

unsuspecting man to rob him at gunpoint of his meager possessions. The next day, he terrorizes a man and his mother who seek only to rid the community of a dilapidated den of illicit activity. In our view, this is the precise prejudice Rule 3:15-2(b), as construed by the Court in Sterling, was intended to prevent. Based on our decision on this issue, we decline to reach the remaining arguments raised by defendant in this appeal.

We vacate defendant's conviction and remand this matter for the State to present the evidence against defendant in two separate trials in accordance with this decision.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4491-15T2