# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2925-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

WALTER O. PEREZ-RAMOS,
a/k/a WALTER O. PEREZ,
and WALTER O. RAMOS,

      Defendant-Appellant.

_____

Submitted December 9, 2025 – Decided January 12, 2026

Before Judges Gilson and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 21-08-0867.

Jennifer N. Sellitti, Public Defender, attorney for appellant (John P. Flynn, Assistant Deputy Public Defender, of counsel and on the briefs).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief; Alexandra E. Harrigan, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Walter O. Perez-Ramos appeals from a May 10, 2023 judgment of conviction entered after he was found guilty by a jury of two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b), two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). We affirm defendant's convictions, but remand for resentencing in accordance with State v. Torres, 246 N.J. 246 (2021).

I.

We summarize the facts and trial testimony relevant to the issues raised on appeal. The State alleged defendant, who was a close and trusted family friend of the child victims, inappropriately touched D.D. and her sister, Y.D., on numerous occasions over the course of several years at the girls' homes in Asbury Park.[1]

In May 2021, D.D., who was then sixteen years old, and Y.D., who was seventeen years old, disclosed to their mother, T.M., that defendant had been touching D.D. inappropriately since she was about eleven years old, and

---

[1] We use initials to protect the identities of victims of sexual offenses. R. 1:38-3(12).

A-2925-22

inappropriately touched Y.D. when she was ten or eleven years old. T.M. and the girls' father took the girls to the Asbury Park police station, where they reported the abuse and gave formal statements. On May 12, 2021, defendant voluntarily gave a recorded statement in which he denied the allegations.

On August 6, 2021, a Monmouth County grand jury returned an indictment charging defendant with: second-degree sexual assault of D.D., (count one); fourth-degree criminal sexual contact of D.D. (count two); third-degree endangering the welfare of a child (D.D.) (count three); second-degree sexual assault of Y.D. (count four); fourth-degree criminal sexual contact of Y.D. (count five); and third-degree endangering the welfare of a child (Y.D.) (count six). The State dismissed count five, criminal sexual contact of Y.D., prior to trial.

On October 26, 2022, the court conducted a pretrial conference at which it reviewed the open-ended voir dire questions proposed by the State and heard the State's motion to admit testimony of D.D. and Y.D. as evidence of "fresh complaints" in accordance with State v. Hill, 121 N.J. 150 (1990), and State v. Bethune, 121 N.J. 137 (1990).

The State proposed the following voir dire question:

> Can you convict a person based solely on the testimony of one victim if you believe the victim's testimony to be

truthful and his/her testimony provides the elements of the law as given to you by the [c]ourt[?] Explain.

Defense counsel had "[n]o objection" to the proposed question.

With respect to the State's proposed fresh complaint testimony, the Assistant Prosecutor advised the court:

Defense counsel and [he] spoke about [it] . . . [a]nd it[ was his] understanding that there [was] no objection to the way the State [was] planning on presenting that evidence.

With regard to the victim, [D.D.], her sister, [Y.D.], was a fresh complaint. And with regard to the victim [Y.D.], the other victim, [D.D.], was a fresh complaint.

They had a discussion approximately a year before this was brought to the police's attention. And basically[,] all that was said between the two girls was that he had touched them both.

In response, defense counsel stated "[t]hat's correct." The court confirmed that counsel "already agreed to limit the fresh complaint testimony in relation to the sisters" and defense counsel responded that "was the understanding." Notwithstanding the parties' agreement and lack of defense objection, the court thoroughly considered the proposed testimony in accordance with standards set forth in Hill and Bethune and allowed "the fresh complaint testimony from [Y.D.] and [D.D.] with regard[] to their disclosure to each other."

A-2925-22

At trial, D.D., who was then seventeen years old, testified she first met defendant when she was "around [eight or nine] years old." Defendant was D.D.'s upstairs neighbor when she lived with her family on Borden Avenue in Asbury Park and "turned into a family friend."

When D.D. was in the fifth grade and "[nine] or [ten] years old," her family moved to Springwood Avenue in Asbury Park. Defendant would come to their apartment on Springwood Avenue because he "was friends with [her] parents, and . . . sometimes . . . work[ed] with [her] dad." At some point, defendant moved into the family's house on Springwood Avenue and lived with them for "a couple of months."

Defendant first touched D.D. inappropriately during the summer before she entered sixth grade, "around 2016," when she was "about [eleven] years old." She and defendant "were in the living room on the couch" and

> [Her] parents were on the porch in the front. . . . [D.D. and defendant] were the only ones in the living room. . . . [She] went to go cover [herself] with a blanket. And he also covered himself with that blanket. And then he put his hands under [her] underwear.

"He was rubbing [her] vagina" and "squeezing it." Defendant also touched her "[o]n [her] breast . . . [o]n top of [her] clothing." He was using "[o]ne hand"

5

and "kind of like massaging it and squeezing it." After he stopped, "[h]e told [her], if [she] ever told anyone, he would hurt [her] or [her] family."

The abuse continued for "[a]round two years" and usually happened "at [her] house . . . [i]n the living room." On one occasion, D.D. went with her siblings and mother "to visit [defendant] where he was staying . . . on Borden [Avenue]." While her siblings were playing outside and her mother was on the phone, defendant "asked [her] to go lay in bed with him." They were "[u]nder the covers" and "he started touching [her], and he just touched [her] vagina."

D.D. testified defendant touched her "over [thirty]" times in two years when she was eleven to thirteen years old, but she could not recall every instance "[b]ecause it was so traumatic that [she] tried to erase it out of [her] mind." "It would usually be the same things[.] . . . He would touch [her] vagina and then [her] breast" over and under her underwear. Defendant would "[s]ometimes . . . ask [her] if [she] had gotten [her] period yet, or he would tell [her] that [she] was developing early." D.D. did not tell anyone because "[she] was scared" of "[h]im hurting [her] or [her] family."

At "the end of seventh grade," D.D and her family moved to a house on Ridge Avenue in Asbury Park. Defendant remained close friends with T.M. Although defendant would visit the family less frequently, "[h]e would buy

[D.D.] jewelry, clothes, . . . money, he bought [her] a phone."  When D.D. "was around [fifteen]," defendant "came up next to [her] while [she] was laying[,] and he put his hand on [her] boob" at the house on Ridge Avenue.

Y.D. was the first person D.D. told about defendant touching her.  "A couple months after the incident at the Ridge [Avenue] house" she told Y.D. what defendant had done to her.  Y.D. became upset, began crying, and "told [D.D.] that [defendant] had touched her" as well.  D.D. "hugged [Y.D.], and [she] started crying with her."

On Y.D.'s seventeenth birthday in May 2021, defendant was at their house on Ridge Avenue.  "When [D.D.] was getting up to go upstairs, [defendant] grabbed [her] arm" and she told him to "let [her] go, and [she] yanked [her] arm off of him."  "[T]hen [she] was walking to the . . . stairs, and . . . he grabbed [her] leg, and then [she] kicked him off."  The next morning, defendant was still at the house because "[h]e had spent the night."  Defendant told D.D. "he was sorry for anything that he had done."

The next day, D.D. "cut [herself] on [her] thighs" with "a razor blade" in her bedroom.  Y.D. "came into [her] bedroom" and asked "why [she] had done it[,] [a]nd [she] told her because of [defendant]."  D.D. said she did not "want to see him again, [and she] just want[ed] everything to be over, and [she did not]

want to keep remembering those memories." D.D. cut herself because she "did[not] want to be alive" and "doing that . . . was kind of relieving [her] pain a little bit."

D.D. testified that Y.D. told their mother what happened when she came home, and her parents "took [her] to the police station." At the station, D.D. "told a police officer that [she] was sexually abused." That was the first time she told anybody "the details of what happened."

Y.D., who was eighteen years old at the time of trial, testified she first met defendant when she was "around fifth grade" and living on Borden Avenue. He was a "family friend" and "was like an uncle to [her]." When she was "around the age of [eleven] or [ten]," defendant "touched [her] breasts and [her] vagina . . . in the backyard . . . staircase" of her house on Springwood Avenue. He touched her with "his hand . . . over [her] clothing" while she was standing. She was "frozen" and "scared."

On another occasion when she was "[a]round [ten] to [eleven]," defendant "gave [her] a kiss" in the living room on Springwood Avenue. Y.D. and defendant were "sitting . . . [o]n the couch" watching television and defendant "kissed [her] [o]n [her] mouth . . . like a peck." Y.D. "was . . . grossed out" and

8

"cleaned [her] lips." Y.D. did not tell anybody about either incident because she "was scared nobody would believe [her]."

When Y.D. was "about [sixteen]," defendant began sending her text messages "from multiple phone numbers." He also sent her text messages and voicemail messages "[t]hrough Instagram." In response, Y.D. "would text . . . would ask him to please leave [her] alone in some of the text messages." Defendant "would ask [her] to text back" and she would tell him "please leave [her] alone, just stop texting [her]."

Y.D. told D.D. what defendant did to her "in the summer, about a year" before they reported the abuse. She told D.D. because "[she] suspected . . . if he had done it to [her], maybe he had done it to [her] sister." The girls were watching television and Y.D. told D.D. what had happened to her. D.D. "said that he had touched her inappropriately" as well. The girls "both cried."

In May 2021, Y.D. found D.D. in her room "harming [herself]" with a "blade." She hugged D.D., "left the room, and [she] called [her] parents asking them to come home immediately." After they arrived home and spoke with D.D., they took D.D. to the police station.

Her parents took Y.D. to the police station and she told the police what defendant did to her and showed them "screenshots of the" texts she received

9

from defendant over several months when she was approximately sixteen years old. She did not save the actual messages and would "block and delete them" because she did not "want to receive any more text[s] from [defendant]."

Several of the text messages and voicemail messages defendant sent Y.D. were read and played for the jury without objection. In the text messages defendant wrote to Y.D., for example, that he "lov[ed] [her] with all [his] soul," "fe[lt] happiness . . . just looking at [her]," was "capable of giving up [his] life for [her]," "[had] seen pretty girls – but they never have [her] qualities," and "kn[ew] that [she did not] love [him] and [her] rejections toward [him] fe[lt] like knife points."

Defendant did not testify at trial. In his closing argument, defense counsel argued "the staleness of [Y.D.] and [D.D.]'s allegations coming some five years after the alleged event renders them suspect. And that delay gives rise to . . . reasonable doubt." He also argued the fact that D.D. "never discuss[ed the claims] with her mom even though she had a close relationship with her" created reasonable doubt.

Counsel argued "there were other men in this house on different occasions. Other males that [had] slept over." He contended "that call[ed] into question . . . a large measure of doubt. Now, God forbid these girls were touched, but

who touched them?"  He also highlighted to the jury that during defendant's recorded interview he claimed he "[n]ever . . . thought of something like this."

The jury found defendant guilty on all counts.  After appropriate mergers, he was sentenced as follows: (1) count one, second-degree sexual assault of D.D., eight years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, Megan's Law reporting requirements, N.J.S.A. 2C:7-1 to -23, and parole supervision for life (PSL), N.J.S.A. 2C:43-6.4; (2) count two, fourth-degree sexual contact with D.D., eighteen months in prison consecutive to count one; and (3) count four, second-degree sexual assault of Y.D., eight years in prison subject to NERA, Megan's Law reporting requirements, and PSL consecutive to counts one and two.  This appeal followed.

## II.

On appeal, defendant raises the following points for our consideration.

> POINT I
>
> THE TRIAL COURT COMMITTED PLAIN ERROR BY QUESTIONING PROSPECTIVE JURORS IN AN UNBALANCED MANNER THAT PREDISPOSED JURORS TO FAVOR THE STATE'S POSITION THAT THE COMPLAINANTS' TESTIMONY ALONE WAS SUFFICIENT PROOF TO CONVICT.

POINT II

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO SEVER SEPARATE CHARGES AS TO EACH COMPLAINANT THAT BORE NO RELEVANCE TO A MATERIAL ISSUE IN DISPUTE.

POINT III

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY NOT TO INFER THAT DEFENDANT'S MESSAGES REFLECTED A CRIMINAL PROPENSITY.

POINT IV

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY NOT TO GIVE UNDUE WEIGHT TO REPLAYED TESTIMONY.

POINT V

THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL.

POINT VI

RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT IMPROPERLY RELIED ON DEFENDANT'S DENIAL OF GUILT TO SUPPORT AGGRAVATING FACTORS AND INAPPROPRIATELY IMPOSED THREE CONSECUTIVE SENTENCES.

A. The court improperly relied on defendant's denial of guilt, in violation of his right against

12

self-incrimination, to support aggravating factors three and nine.

B. The trial court erred in imposing three consecutive sentences without providing an explicit statement of reasons analyzing the overall fairness of the aggregate sentence.

## III.

We are unpersuaded by defendant's argument, raised for the first time on appeal, that the voir dire question posed by the court was improper. Criminal defendants have the "constitutional right to be fairly tried by an impartial jury." State v. Williams, 93 N.J. 39, 61 (1983). Trial courts have a duty "'to take all appropriate measures to ensure the fair and proper administration of a criminal trial,'" and that duty begins with a proper voir dire. State v. Fortin, 178 N.J. 540, 575 (2004) (quoting Williams, 93 N.J. at 62).

Appellate courts "review the trial court's conduct of voir dire at defendant's trial in accordance with a deferential standard. '[A] trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury.'" State v. Little, 246 N.J. 402, 413 (2021) (alteration in original) (quoting State v. Winder, 200 N.J. 231, 252 (2009)). A "'court's exercise of discretion in dealing with requests for specific inquiries of prospective jurors in the voir dire examination is subject to

reversal only on a showing of prejudice in that the voir dire examination failed to afford the parties an opportunity to select an impartial and unbiased jury.'" Id. at 413-14 (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1.2 on R. 1:8-3 (2021)). While inquiries should be designed to detect bias, acceptable voir dire questions should be distinguished from "inquir[ies] that may improperly indoctrinate jurors as to the outcome they should reach in a given case." Id. at 414.

In this case, the court asked potential jurors: "Can you convict a person based solely on the testimony of one victim, if you believe the victim's testimony to be truthful and his/her testimony provides the elements of the law as given to you by the [c]ourt[?] Explain." Defendant contends "this question indoctrinated jurors to favor the State's position that the complainants' testimony alone was sufficient to prove the charges . . . without physical evidence or other direct proof." He also argues the question was "unnecessarily confusing" and the court improperly "read the question as written without offering any further instructions on the relevant legal principles or the meaning of this question."

Because defendant did not object to the question at trial, we review this issue for plain error. State v. Singh, 245 N.J. 1, 13 (2021) (citing R. 2:10-2). Rule 2:10-2 prescribes "[a]ny error or omission shall be disregarded by the

appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R[ule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting Funderburg, 225 N.J. at 79).

We do not perceive any basis to find error, much less plain error. The voir dire question was not improperly suggestive or worded in a way that would indoctrinate jurors as to the outcome they should reach in the case. In contending that the jury question was imbalanced and confusing, defendant relies on Little. In Little, the challenged jury question told prospective jurors that the State was not required to produce physical evidence, in that case a gun, to prove its case, and asked them if the failure to do so would affect their ability as a juror. 246 N.J. at 409-11. Our Supreme Court held the question was improperly suggestive. Id. at 419.

Unlike in Little, the question here did not tell the jurors the State was not required to produce physical evidence to obtain a conviction or otherwise

instruct the jurors regarding the type of evidence required. Rather, it asked if the jurors could find guilt in accordance with the court's instructions based solely on the testimony of a complainant. The question was plainly worded and not "unnecessarily confusing" or "unbalanced." There was no need for the court to "offer any further instructions" or explain "the meaning" of the question posed.

Having reviewed the jury voir dire in this case, we discern no error that undermined the selection of an impartial jury. See Little, 246 N.J. at 413 (quoting Winder, 200 N.J. at 252) (explaining that a trial court's decisions during voir dire should not be disturbed "except to correct an error that undermines the selection of an impartial jury").

IV.

Defendant's claim that the court committed plain error by "failing to sever separate charges as to each" victim is unconvincing. Because defendant failed to move for severance before trial, we review for plain error. State v. Keely, 153 N.J. Super. 18, 22 (App. Div. 1977).

Pursuant to Rule 3:15-2(c), "[a] motion for separate trial of counts of an indictment . . . must be made pursuant to [Rule] 3:10-2." Rule 3:10-2(c) states "defenses and objections based on defects in the . . . indictment . . . must be

16

raised by motion before trial" and the failure to do so "constitutes a waiver thereof."

Rule 3:7-6 permits the State to charge multiple offenses in a single indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together."   "Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72 (2013).

"Charges need not be identical to qualify as 'similar' for purposes of joinder under [Rule] 3:7-6." Id. at 91.  Rather, all that is required is "some connection between separate counts rendering the evidence probative of a material issue in another charge." Ibid.  "The test is whether the evidence from one offense would have been admissible N.J.R.E. 404(b) evidence in the trial of the other offense[.] . . ." Id. at 98.  "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

N.J.R.E. 404(b)(1) to (2) provides, in pertinent part:

17

[E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.

This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

To be admissible:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[State v. Cofield, 127 N.J. 328, 338 (1992) (footnote and citation omitted).]

We are satisfied there is no basis to find the court committed plain error by not, sua sponte, severing the charges in this case. Evidence that defendant abused both victims would have been admissible in either trial to rebut, among other things, defendant's claims that the victims misperceived his innocent conduct as a close family friend to be sexual abuse or were mistaken and may

18                                                              A-2925-22

have been abused by another male who stayed at their homes.  Such evidence would have been admissible under N.J.R.E. 404(b) to show "absence of mistake or accident."

In addition, defense counsel made the strategic decision to allow the victims to testify they disclosed the abuse to each other simultaneously before they reported the abuse.  Based on that strategy, the jury would have been aware of the allegations of both victims even if the charges were severed for separate trials.

Moreover, under the totality of the facts and circumstances of this case, there is no basis to find the court committed plain error by not severing the charges.  The court instructed the jury that they were to consider each of the charges separately. Specifically, that:

> There are five offenses charged in the indictment. They are separate offenses by separate counts in the indictment.  In your determination of whether the State has proven the defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, the defendant is entitled to have each count considered separately by the evidence, which is relevant and material to that particular charge based on the law as [the court] give[s] it to you.

We presume a jury abides by the court's instructions.  State v. Burris, 145 N.J. 509, 531 (1996).  Here, the charges were supported by the detailed

A-2925-22

testimony of the victims regarding the alleged abuse, and Y.D.'s allegations were corroborated by numerous text and voicemail messages defendant sent her expressing his love and affection for her. We are persuaded trying the charges together did not lead "'the jury to a result it otherwise might not have reached.'" Dunbrack, 245 N.J. at 544 (quoting Funderburg, 225 N.J. at 79).

V.

Defendant's remaining arguments lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). Defendant's text messages and voicemail messages to Y.D. directly proved the allegations that he touched Y.D. inappropriately because he was sexually attracted to her, and rebutted his claim, during his recorded interview and repeated by counsel in summation, that he "[n]ever . . . thought of something like this" referring to touching the victims. The court was not required to give a limiting instruction because the evidence was intrinsic and not evidence of other crimes, wrongs, or acts subject to N.J.R.E. 404(b). State v. Rose, 206 N.J. 141, 180 (2011). We are convinced it was not error, much less plain error, to admit defendant's messages to Y.D. without a limiting instruction.

We do not perceive any basis to find plain error because the court did not read Model Jury Charges (Criminal), "Playback of Testimony" (approved Apr.

16, 2012) after the testimony of D.D. and Y.D. was replayed during jury deliberations. The court properly instructed the jury the day before that they were to reach a verdict only after full and impartial consideration of all the evidence. We presume the jury followed this instruction and did not place undue emphasis on the testimony that was played back. Burris, 145 N.J. at 531. Finally, we are persuaded reversal is not required by the cumulative effect of the alleged errors.

VI.

In Torres, our Supreme Court held that when a court imposes consecutive sentences it must provide "[a]n explicit statement, explaining the overall fairness of a sentence imposed." 246 N.J. at 268. Here, the court imposed consecutive sentences without including that required statement and therefore, failed to confirm that it had analyzed the overall fairness of the sentence imposed. Accordingly, we are constrained to remand for resentencing.

As a result, we need not reach defendant's remaining sentencing arguments. We note, however, that on remand, it is generally not appropriate to find aggravating factors based on a defendant's refusal to acknowledge guilt following conviction. See State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985) ("[A] defendant's refusal to acknowledge guilt following a conviction is

21

generally not a germane factor in the sentencing decision"); State v. Jiminez, 266 N.J. Super. 560, 570 (App. Div. 1993) ("A defendant has a right to defend, and a sentencing judge may not enhance the penalty because [a defendant] contests [their] guilt"); N.J.S.A. 2C:44-1(c)(1) ("[F]ailure to . . . plead [guilty] shall not be considered in withholding or imposing a sentence of imprisonment").

Affirmed in part. Vacated and remanded in part for proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division